UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
CHARLES MILLER,                                           :
                                                         :                MEMORANDUM AND ORDER
                                    Plaintiff,            :
                                                         :                05-CV-5495 (ENV)
                -against-                                 :
                                                         :
NATIONAL ASSOCIATION OF SECURITIES                       :
DEALERS, INC.,                                           :
                                    Defendant.           :
                                                         :
------------------------------------------------------------------ x

**VITALIANO, D.J.**

Charles Miller ("Miller" or "plaintiff") brings this action against his former employer, the

National Association of Securities Dealers, Inc. ("NASD" or "defendant"), alleging that he was

terminated from his employment at NASD on March 19, 2004 as a result of discrimination and

thereby deprived of certain retirement benefits. By decision and order dated September 19,

2006, the Court dismissed plaintiff's state law claims with prejudice pursuant to Federal Rule of

Civil Procedure 12(b)(6), leaving for consideration only his federal claims of wrongful

discrimination and denial of pension benefits. Subsequently, defendant moved for summary

judgment dismissing these remaining federal claims pursuant to Federal Rule of Civil Procedure

56. For the reasons stated below, defendant's motion is granted.

## BACKGROUND

The following facts are drawn from the complaint and the submissions of the parties on

defendant's Rule 56 motion for summary judgment, including its statement of undisputed

material facts pursuant to Local Civil Rule 56.1 and plaintiff's reply thereto. The facts are

construed, as they must be, in the light most favorable to the nonmoving party. See Allstate Ins.

Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 456 (2d Cir. 2007). Any relevant fact disputes are noted.

Miller was hired by NASD as an Examiner Trainee in December 1985, when he was 34 years of age, and received several promotions during his first few years of employment there. In 1990, Miller attained the position of Field Supervisor, which he held until NASD terminated his employment approximately 14 years later. As Field Supervisor, Miller's duties chiefly involved examining member firms for compliance with NASD rules concerning their financial and operational conditions, as well as their sales practices. In this capacity, Miller performed both "cycle" examinations, conducted on-site at NASD member firms every one to four years, and "cause" examinations, which are commenced when NASD receives a complaint about a member firm or when a registered representative is terminated for cause.

Miller was assigned to the Cause Section in 1996, but was reassigned about 18 months later at his own request to the Cycle Section. Thereafter, during the last five years of his employment at NASD, he primarily conducted cycle examinations. Cycle examinations typically can be completed within a few days to a few weeks, and Miller usually worked on three or four of them simultaneously. There was no annual quota or other specific target in place regarding the number of cycle examinations that a field supervisor was expected to complete.

As with all non-officer NASD employees, Miller received written reviews of his work performance on an annual basis. Until calendar year 2003, Miller's evaluations indicated that, on the whole, he met or exceeded his employer's expectations. However, from 1998 onward, the evaluations also noted deficiencies in Miller's productivity, efficiency and work product quality.[1]

---

[1] While Miller presumably received performance evaluations prior to 1998, there is no documentation of such evaluations in the record.

2

Miller's 1998 evaluation was signed by Joseph Mazur, who was his immediate supervisor at the time, as well as by Mazur's then immediate supervisor, Joseph McCarthy.[2] (See Walker Aff., Ex. G).[3] Part 1 of this evaluative report assessed Miller's performance in eight "Essential Job Functions": conducting examinations; mentoring; following rules and procedures; working well with supervisors; reviewing financial information; participating in special projects/task forces; maintaining core files; and responding to internal and external inquiries. In all but the first of those eight categories, Miller was reviewed positively or satisfactorily, and his "Future Performance Expectation" was marked "Continue." However, regarding the first job function, the 1998 evaluation indicated a need for improvement – specifically, it noted that Miller "needs to improve the quantity and quality of his examinations." (Id. at 3). Part 2 contained a detailed appraisal of nine specific aspects of Miller's work: knowledge / application; quality of work; quantity of work / organizational skills; initiative; interpersonal skills / teamwork; problem-solving skills / decisions; procedural compliance; communication skills; and service quality. With respect to four of these aspects – work quality and quantity, initiative and communication – Miller's 1998 evaluation reflected some problems, illustrated by examples from the ten cycle examinations he had conducted that year. Such negative feedback included the following:

- "[Miller] does not always turn in examinations that are of high quality."
- "[Miller] should be more attentive to the details of his examinations."
- "[Miller] does not always complete his examinations within time periods that are expected of someone with his experience."
- "[Miller] needs to strengthen his ability to take independent action in addressing and developing issued encountered . . . prior to the supervisory review. For example, [Miller] will detect a problem but not adequately address the situation during the exam."

---

[2] With respect to each annual evaluation in the record, Miller points out that, although both his supervisor and his supervisor's supervisor signed the document, it appears that only the former authored the substantive portions.
[3] References to "Walker Aff." denote the affidavit of Peter A. Walker in support of defendant's motion for summary judgment.

- "[Miller] does not fully narrate his reviews as called for in his job expectations."

(Id. at 7-9). The 1998 evaluation concluded with a description of Miller's major strengths and weaknesses – Miller's methodical approach to assignments and his helpfulness to coworkers received praise, but the quality and quantity of his examinations and his understanding of relevant procedures and computer applications were deemed below par, despite some improvement in the final quarter of 1998. Accordingly, two "development goals" were communicated to Miller: "strengthen the ability to conduct quality cycle exams and other assignments in a timely manner by acquiring the skills and knowledge to increase productivity," and "take the initiative to improve computer skills." (Id. at 11).

Miller availed himself of the opportunity to submit a written response to his 1998 evaluation (as he did for every annual evaluation in the record), expressing his disagreement with the substance of some of his supervisors' criticisms. In the response to his 1998 evaluation, Miller stated, *inter alia*, that "there was a learning curve in this review period . . . . and I attribute any procedural deficiencies primarily to this." (Id. at 12).

In 1999, Miller's evaluation was again signed by Mazur, as his immediate supervisor, and by Mazur's then immediate supervisor, Louis Hampstead. (See Walker Aff., Ex. H). That year, Miller had completed 14 examinations. In Part 1 of the 1999 evaluation, Miller received across-the-board positive or satisfactory reviews in all eight essential job functions, but the comments stated that Miller should continue his efforts to increase his productivity by seeking out even more training in examination procedures and computer programs. Similarly, Part 2 indicated that Miller had exhibited improvement in the areas of weakness that had been identified the previous year, but that further progress was still necessary. The same two developmental goals identified for Miller in the 1998 evaluation were repeated in the 1999 evaluation. Once again,

Miller submitted a written response to the 1999 evaluation in which he sought to defend particular examples of his work cited as problematic.

For the calendar years 2000 through 2003, Miller's evaluations were signed by Anhad Sachdev, who by then had replaced Mazur as Miller's immediate supervisor, and Mazur, who had moved up the ranks and was then Sachdev's supervisor. (See Walker Aff., Ex. I, J, K, L). Although the evaluation form changed in 2000, the substance remained similar – employee performance, overall as well as in various specific job functions, was rated on a five-level scale ranging from "exceptional performance" to "does not meet expectations." Miller's 2000 evaluation indicated that he met expectations overall and met or exceeded expectations in all job functions, but once again noted that Miller needed to improve his efficiency, increase the number of examinations completed (which, in 2000, was ten) and "continue to gain a full working knowledge of examination procedures and related in-house computer applications." (Walker Aff., Ex. I at 4). The conclusion of the 2000 evaluation was fairly upbeat, noting: "To be sure, [Miller] has made progress in the last year . . . . We believe that with continued effort on his part, [Miller] can improve his performance." (Id. at 12).

The basic tenor of Miller's 2000 evaluation was echoed in 2001, when he conducted ten to 12 examinations.[4] Once again, Miller's overall rating in 2001 was accompanied by an expression of his supervisors' confidence in his ability to realize his potential. That year, however, an additional performance deficiency was identified: "[Miller] needs to use his experience in developing the examination findings to a level at which they can easily be presented to the Legal group for opinion." (Walker Aff., Ex. J at 10). Further, the self-appraisal portion reflected that Miller himself was concerned with the potential implications of a new

---

[4] The 2001 evaluation stated that Miller "participated" in ten examinations, but in his self-appraisal, Miller responded that he believed he had initiated 12 examinations that year and completed 11 of them. (Walker Aff., Ex. J at 3, 12).

technological program for examinations that NASD was about to roll out, dubbed "INSITE." When asked to identify what aspects of his job or skills could use improvement or development, Miller answered: "The coming year will bring the INSITE program which will require me to learn and adapt to the different processes and components associated with the new system." (Id. at 14). In response to "Please list any questions you may have about your job," Miller asked: "What is the expected start date for INSITE and how will this effect [sic] my job? Will INSITE streamline the current examination process and allow the examiner to easily focus in on the members main thrust of business? Or will it provide an all encompassing outline for the examiner to analyze the member firm in total?" (Id.).

Sure enough, Miller's unfamiliarity with INSITE manifested as yet another source for concern in his 2002 evaluation, which again noted his participation in ten examinations but observed: "However, [Miller] has commenced only one examination using the new examination tool INSITE." (Walker Aff., Ex. K at 3). Several other references to Miller's lack of proficiency in INSITE were made throughout the 2002 evaluation. (See id. at 6, 8). Further, in addition to by then de rigueur jabs regarding Miller's productivity, efficiency and detail-orientation, the 2002 evaluation stated that Miller needed to take on "more complex assignments" and "follow-up on red flags noted during his examinations," which on some occasions "were not fully explored and documented." (Id. at 3). It also indicated that, despite having been told to do so the year before, Miller had not effectively addressed the need to improve his examination reports to the point where they could be presented to the NASD legal group without significant follow-up. Perhaps most ominously, the comments in the 2002 evaluation regarding Miller's overall rating of "meets expectations" did not include the proclamation made in prior years regarding his supervisors' ultimate faith in his ability to improve.

On September 30, 2003, NASD commenced formal corrective action against Miller. Sachdev, still his immediate supervisor, issued a written warning to him regarding his performance, which was delivered by Joseph Palya of Human Resources in a meeting at which Sachdev and Mazur were also present. The warning stated:

> Over the period of time from January 2003 to the present we have had several conversations regarding your performance deficiencies including such matters as the quality of your work and productivity. These issues have also been discussed in the annual reviews. We have discussed instances where you did not fully explore certain areas while conducting routine examinations with the result that related rule violations were not cited. We have also discussed instances where the accuracy of your findings was suspect. Finally, your lack of familiarity with all aspects of EET [a computer program] was talked about. To assist you, a refresher course in EET was offered, but you did not wish to avail yourself of that opportunity.

(Walker Aff., Ex. M at 1). The warning informed Miller that, if he did not improve his performance within 60 days, further action up to and including termination could result.

At his deposition in this action, Miller testified that he was surprised to be brought before the Human Resources department for formal, written disciplinary action in September 2003 because Sachdev had not previously warned him that he was considering taking such action. Miller recalled conversations with Sachdev prior to September 30, 2003 in which Sachdev told Miller to "keep the exams coming in," and acknowledged that he had understood that as a direction to step up his productivity. (See 56.1 ¶ 38).[5] However, in opposition to summary judgment, Miller stresses that in his view these discussions with Sachdev were "insignificant and purely coincidental to his being with Sachdev on other business related matters," and the comments Sachdev made were not "specifically directed at [Miller's] lack of productivity, but rather were "general statement[s] Sachdev (and other supervisors) made to employees generally

---

[5] References to "56.1" denote NASD's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1.

to increase the overall productivity of the District." (56.1 Reply ¶ 38).[6] Likewise, while Miller concededly had similar exchanges with Mazur, he asserts that Mazur's comments on productivity were not directed specifically at him. (See 56.1 ¶ 39; 56.1 Reply ¶ 39). As to the EET training session referenced in the September 30, 2003 warning, Miller does not dispute that he turned down Sachdev's suggestion that he attend, but notes that he thought it would be duplicative of prior training and believed he could best achieve familiarity with the program by using it in actual work situations. Upon receiving the warning, Miller signed up for the EET training after all. (See 56.1 Reply ¶¶ 34, 36).

On December 5, 2003, during a meeting with Sachdev and Rita Pruscino of Human Resources, Miller received a memo from Sachdev stating that he had failed to improve his performance, citing additional specific work issues and placing him on formal probation for 90 days. (See Walker Aff., Ex. N). While Miller disputes a few of the complaints listed in the probation memorandum, he does not claim that they were false or fabricated – rather, he seeks to draw attention to extenuating circumstances and shift blame to Sachdev. For example, regarding one particular examination, the probation memorandum criticized Miller for inadequately investigating a potential "G-14" violation. Miller points out that, ultimately, no such violation was charged, and adds that the complaint "belies the fact that the alleged violation presented a complex situation requiring a significant amount of time to research," and "any delay in that examination could have been prevented if Sachdev had directed [Miller] to initiate a Special Examination in order to clear up the G-14 issue." (56.1 Reply ¶ 39). Regarding a different examination, the probation memorandum stated that Miller started a key interview late and did not come prepared with copies of exhibits for the second and third chair attorneys, to which

---

[6] References to "56.1 Reply" denote Miller's Reply Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1.

Miller counters "it was Sachdev himself who caused [it] to be late" and "all participants had sufficient copies of all documents." (Id.). Yet Miller does not quarrel with two other, more substantive comments in the probation memorandum about the same interview: that he phrased questions incorrectly and that he failed to pursue red flags mentioned in responses. In any event, Miller by and large does not quarrel with the facts surrounding the grievances cited in the probation memorandum, maintaining instead that these were mere hair-splitting quibbles that "normally would be handled in a routine manner as part of a normal collaboration between a Field Supervisor and his boss, [and] [i]n no event would these alleged deficiencies be so severe as to warrant the type of disciplinary action associated with a memo of this type." (Id.). Further, he contends: "Sachdev routinely ignores similar deficiencies from younger employees." (Id.).

In January 2004, shortly after he was placed on probation, Miller received an unfavorable annual performance evaluation for 2003, indicating that his performance overall failed to meet expectations and identifying specific problems with eight of the nine examinations that he conducted that year. (See Walker Aff., Ex. L). The 2003 evaluation observed that Miller had not made necessary strides towards completing more examinations, producing higher-quality reports and mastering in-house computer programs such as EET and INSITE, and concluded that Miller had "to quickly improve his productivity, job knowledge, and performance to the point that is expected of an examiner with his experience and tenure." (Id. at 13). In addition to contesting specific complaints in the 2003 evaluation, Miller's written response that year stated that many of his examinations had been conducted under extraordinarily challenging and stressful conditions, and that any EET-related issues had occurred "when [he] was conducting [his] first batch of examinations on EET and was struggling with the system, as did many examiners." (Id. at 16). In the 2003 self-appraisal, Miller also described his work load as

"excessive", and stated that he worked extremely long hours and did not know of any other examiner who kept a comparable schedule. (Id. at 17).

On March 19, 2004, in a meeting with Palya and Sachdev, Miller received written notice of termination of his employment by NASD on the ground that he had failed to remedy his performance deficiencies after being given 150 days (60 days for the warning notice and 90 days for the probation memo) to do so. Miller vehemently disputes that his performance failed to improve prior to termination, and also disputes that it was ever significantly deficient. He testified that he believes his termination was motivated by his supervisors' discriminatory animus on the basis of his age, as well as his proximity to retirement.

At the time of his termination in March 2004, Miller was 52 years old, a vested participant in NASD's retirement plan, and approximately two years away from eligibility for early retirement. In July 2004, Miller received a lump sum payment of $107,437.98 from the NASD retirement plan. If Miller had not been terminated and instead had opted for early retirement when he became eligible on his 55th birthday, he would have received a lump sum pension benefit of $251,201.32.

Miller testified that he has no recollection of ever informing his supervisors or anyone else at NASD that he believed he was being discriminated against because of his age, nor does he have any recollection of any discriminatory comments that were ever made to him regarding his age. After disciplinary action was initiated against Miller in September 2003, but before he was terminated, Miller recalled having one-on-one conversations with both Mazur and Sachdev in which he expressed his concern about losing retirement benefits in the event of his termination. However, he did not recall whether he ever told them or anyone else at NASD that he intended to

retire as soon as he qualified for early retirement, nor did he recall any comments indicating intent to terminate him in order to deny him pension benefits.

On August 27, 2004, Miller filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR"), alleging that NASD had violated the New York State Human Rights Law, Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA") by discriminating against him on the basis of his age, race, sex, and creed. After investigating the complaint, NYSDHR issued a Determination and Order on December 22, 2004 finding no probable cause to believe that NASD had engaged or was continuing to engage in unlawful discriminatory practices against Miller. NYSDHR noted that NASD had stated legitimate nondiscriminatory reasons for Miller's termination and determined that there was insufficient evidence to conclude that those reasons were pretextual. Additionally, NYSDHR made the following observations regarding the overall makeup of Miller's workplace:

> The record indicates that, from January of 2003 to September of 2004, excluding [Miller], [NASD] employed twenty persons as Field Supervisors in their New York City District Office. Of the twenty, a majority were male, the same sex as [Miller]. Also, a majority were White, the same race as [Miller]. One of the Field Supervisors was a White male who was older than [Miller], and his employment was not terminated by [NASD]. It is also significant that another of the Field Supervisors, who is White and older than [Miller], was hired approximately one month prior to [Miller's] termination.

(Walker Aff., Ex. D at 2).

At the conclusion of the Determination and Order, NYSDHR informed Miller that he had the right to appeal to the Supreme Court in the county in which the alleged discriminatory practices took place within 60 days of service of the Decision and Order. Instead of pursuing this option, on January 7, 2005 Miller requested that the Equal Employment Opportunity

Commission ("EEOC") review NYSDHR's Determination and Order. The EEOC did so, and adopted the findings of NYSDHR in March 2005.

Miller filed the present action against NASD on June 6, 2005 in Nassau County Supreme Court, alleging that NASD wrongfully terminated Miller's employment based "solely upon prohibited discriminatory factors with the purpose of denying him continued employment which would have qualified him to receive a pension to which [*sic*] he would have otherwise received in just over two years of his date of termination." (Walker Aff., Ex. A ¶ 15). The action was removed to this Court on November 23, 2005. On September 19, 2006, this Court dismissed Miller's state law claims with prejudice, leaving only Miller's federal claims of discrimination and wrongful denial of pension benefits for consideration.

## DISCUSSION

### A. **Summary Judgment Standard**

The Court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there <u>are</u> issues of fact to be tried." <u>Sutera v. Schering Corp.</u>, 73 F.3d 13, 16 (2d Cir. 1995) (internal quotation marks omitted) (emphasis in original). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, <u>see</u>, <u>e.g.</u>, <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 553 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. <u>See</u>, <u>e.g.</u>, <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line. Inc.</u>, 391 F.3d 77, 83 (2d Cir. 2004); <u>Hetchkop v. Woodlawn at Grassmere, Inc.</u>, 116 F.3d 28, 33 (2d Cir. 1997) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. See Fed. R. Civ. P. 56(e). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986) (internal citations omitted).

The Second Circuit has often cautioned that courts should be "chary" in granting summary judgment in employment discrimination cases, where intent of the employer is usually a central factual issue. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 71 (2d Cir. 2000) (citing Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 87 (2d Cir. 1996)); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). "[E]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999). Notwithstanding, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001). "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." Schwapp, 118 F. 3d at 110; see Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994) ("[S]ummary judgment

remains available to reject discrimination claims in cases lacking genuine issues of material fact." )).

## B. Age Discrimination Claim

Plaintiff generally alleged in the complaint that his termination by defendant "was based solely upon prohibited discriminatory factors," without specifying what those factors were. His previously-filed NYSDHR charge expressly asserted discrimination on the basis of age, race/color, sex and creed. However, in the course of this action plaintiff dropped any claims for discrimination on the basis of sex, race, color, or creed, and now maintains only that he was discriminated against "on the basis of age in order to deny him retirement benefits." (56.1 ¶ 9; 56.1 Reply ¶ 9).

The ADEA establishes that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges or employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Congress promulgated the ADEA to address the concern that older workers are subject to employment disadvantages due to negative stereotypes about their ability to work. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 609-10, 113 S. Ct., 1701, 1706 (1993) ("It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age."). The ADEA does not, however, prohibit employee termination based on any reasonable factor other than age, even if such a factor is correlated with age: for example, retirement eligibility and pension status. See 29 U.S.C. § 623(f)(1); Hazen Paper, 507 U.S. at 611, 113 S. Ct. at 1706 ("[T]he ADEA commands that . . . . [t]he employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly. When the

employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is." (emphasis in original)). Accordingly, the Court considers plaintiff's claim that he was discriminated against on the basis of his age separately and independently from his claim that he was discriminated against for the purpose of denying him retirement benefits.

The class entitled to the statutory protection of the ADEA is limited to persons 40 years of age or older. See 29 U.S.C. § 631(a). Plaintiff was 52 years old when he was terminated, and is therefore covered by the ADEA.

1. *McDonnell Douglas Burden-Shifting Analysis*

The Second Circuit has routinely analyzed ADEA claims using the burden-shifting framework for Title VII claims established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). See, e.g., Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001). Under the familiar rubric of McDonnell Douglas, a plaintiff first establishes a prima facie case of employment discrimination using circumstantial evidence, after which the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the alleged disparate treatment, thus shifting the burden back to the plaintiff to establish that defendant's proffered legitimate nondiscriminatory reason is mere pretext. See Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citing McDonnell Douglas, 411 U.S. at 802-04, 93 S. Ct. at 1824-25). Critically, although McDonnell Douglas shifts the burden of production back and forth between the parties, the ultimate burden of persuasion for a claim of intentional discrimination is always on the plaintiff. See Texas Dep't of Cmty. Affairs. v. Burdine, 450 U.S. 248, 253, 101 S. Ct 1089, 1093

(1981) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.").

The Supreme Court has within the last year clarified the standard for prevailing on an ADEA claim, in Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343, 2349 (2009). While the Supreme Court's ruling in Gross did not "reject the McDonnell Douglas burden-shifting framework for ADEA cases altogether," Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010), it made clear that the ADEA and Title VII are "materially different with respect to the relevant burden of persuasion." Gross, 129 S. Ct. at 2348. According to Gross, the burden of persuasion required by the ADEA is more onerous – Title VII permits a plaintiff to establish discrimination by showing that his inclusion in a protected class "was simply a motivating factor" in his employer's adverse employment action, id. at 2349, but "under the plain language of the ADEA, an employee bringing a disparate treatment claim must prove by a preponderance of the evidence that age was the 'but-for' cause behind the employer's adverse decision, and not merely one of the motivating factors." Hrisinko v. N.Y.C. Dep't of Educ., No. 08-6071-cv, 2010 WL 826879, at *1 (2d Cir. Mar. 11, 2010) (quoting Gross, 129 S. Ct. at 2350).

Recently, after assessing the impact of the Supreme Court's holding in Gross, the Second Circuit concluded that it "remain[s] bound by, and indeed see[s] no reason to jettison the [McDonnell Douglas] burden-shifting framework for ADEA cases that has been consistently employed in our Circuit." Gorzynski, 596 F.3d at 106 (citing D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 195 (2d Cir. 2007). Accordingly, while remaining cognizant that "Gross changed the latter part of the McDonnell Douglas formulation by eliminating the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases," Hrisinko, 2010 WL

826879, at *1, this Court will analyze plaintiff's age discrimination claim using the traditional burden-shifting framework.

## 2. *Prima Facie Showing of Age Discrimination*

In order to establish a prima facie case of age discrimination in violation of the ADEA, plaintiff must show: (1) that he was within the protected age group (more than 40 years old); (2) that he was qualified for his position; (3) that he experienced adverse employment action; and (4) that such action occurred under circumstances giving rise to an inference of discrimination. See Gorzynski, 596 F.3d at 107 (citing Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "The burden of establishing a prima facie case of disparate treatment is not onerous." Burdine, 450 U.S. at 254, 101 S. Ct at 1094. At the age of 52, after nearly two decades of working for defendant and receiving promotions on multiple occasions,[7] plaintiff was fired. Consequently, there is no dispute that he has established the first three elements of his prima facie case of age discrimination. Defendant argues, however, that plaintiff has failed at the fourth element because he has not demonstrated that the circumstances surrounding the adverse employment action give rise to an inference of discrimination.

Circumstances contributing to an inference of age-based employment discrimination may include: invidious comments about people in the protected age class; more favorable treatment of younger employees; criticism of an employee's work performance in age-related degrading terms; a sequence of events leading to an employee's termination; or the timing of the

---

[7] To show "qualification" for purposes of his prima facie case, Miller need only make the "minimal showing" that he "possesses the basic skills necessary for performance of [the] job." Owens v. N.Y.C. Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991) (quotation marks omitted). In a discrimination case alleging wrongful termination, "the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that [he] is minimally qualified," and the inference is heightened where the length of employment was significant and the employee received promotions. Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001). Nonetheless, "[a]n employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action." Id.

termination. See generally Chambers, 43 F.3d at 37 (collecting cases). Statistical information, such as a significant decrease in average employee age within a short time after a younger decisionmaker is hired, may be considered as circumstantial evidence supporting the necessary inference of discrimination. See, e.g., Stratton v. Dep't for the Aging, 132 F.3d 869, 879-80 (2d Cir. 1997); see generally Pleau v. Centrix, Inc., 343 Fed. Appx. 685, 699, 2009 WL 2603396, at *2 (2d Cir. Aug. 26, 2009). However, "statistical proof alone cannot ordinarily establish a prima facie case of disparate treatment." Martin v. Citibank, N.A., 762 F.2d 212, 218 (2d Cir. 1985) (emphasis added).

According to NYSDHR's investigation, plaintiff was the second-oldest member of his department, and plaintiff contends that he was saddled with more demanding and time-intensive tasks than similarly situated younger employees. (See Miller Dec. ¶ 7 ("[N]o other examiner or Field Supervisor was assigned the workload I was assigned . . . . [and] nearly every employee working in my department was twenty years my junior in age.")).[8] Additionally, he claims that he was evaluated more stringently and received harsher treatment than younger employees. (See id. ¶ 10 ("Although the errors noted may have been accurately reported as stated in the probation memo these are normal run of the mill errors that are routinely dealt with without resorting to the drastic disciplinary measures used against me . . . . Regarding the second examination [ ] complained of by Sachdev it involves another soft commitment by me to get the report to him. In fact there was not imperative for the report to be handed in at mid-day and this too was used as a means to discipline me when such 'soft' commitments are routinely ignored by Sachdev when they are made by younger employees.")).

Considering the facts in the light most favorable to plaintiff, taken as a whole rather than individually, and mindful that the Second Circuit has "characterized the evidence necessary to

---

[8] References to "Miller Dec." denote Miller's declaration in opposition to NASD's motion for summary judgment.

satisfy this [prima facie] burden as 'minimal' and 'de minimis'", Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001), the Court finds that plaintiff has adequately shown that the circumstances surrounding his termination give rise to an inference of age discrimination, and accordingly, that he has established a prima facie case of age discrimination for McDonnell Douglas purposes.

   3. *Articulation of Legitimate, Nondiscriminatory Reason for Termination*

     Under McDonnell Douglas, the burden of production now shifts to defendant to articulate some legitimate, nondiscriminatory reason for its adverse employment action against plaintiff. See Burdine, 450 U.S. at 254, 101 S. Ct at 1094. As with plaintiff's prima facie case, "defendant's burden is one of production, not persuasion, and the Court's analysis at this stage can involve no credibility assessment of the evidence." Cretella v. Liriano, 633 F. Supp. 2d 54, 72 (S.D.N.Y. 2009) (citations and internal quotation marks omitted). Accordingly, at this point, defendant need only present a clear explanation for plaintiff's termination, not prove that the proffered explanation was the actual reason for its decision. See Gibbs v. Consol. Edison Co. of N.Y., Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989).

     Defendant maintains that plaintiff was fired because of his allegedly inadequate and unsatisfactory job performance over the preceding six years, and his failure to respond to defendant's concerns after two written warnings, an unsatisfactory annual review and a 150-day formal probationary period. The Court finds that defendant has carried its burden under McDonnell Douglas.

### 4. *Pretext and 'But For' Causation*

Following defendant's presentation of a legitimate, nondiscriminatory reason for plaintiff's termination, the shifted burden of production becomes irrelevant, and the presumption raised by the prima facie case drops from the case. See Burdine, 450 U.S. at 255, 101 S. Ct. at 1094-95. Plaintiff may still prevail if he can show that defendant's decision to terminate him was, in fact, the result of age discrimination. Thus, the Court must now determine whether plaintiff "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause of [defendant's] decision to fire [him]. In this respect, it is important to consider whether the explanations that [defendant] gave for [plaintiff's] firing were pretextual." Gorzynski, 596 F.3d at 107.

Pretext "may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent, 198 F.3d 68, 72 (2d Cir. 1999) (quotation omitted). A "fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable," but should instead "determin[e] whether the articulated purpose is the actual purpose for the challenged employment-related action." DeMarco v. Holy Cross High Sch., 4 F.3d 166, 170-71 (2d Cir. 1993). "The pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." Id. at 171.

According to defendant, the basis for its decision to terminate Miller's employment was his consistent failure over a six-year period to meet defendant's standards for efficiency, productivity and work product quality, despite being given notice that his performance was lacking and time to make the necessary improvements. Plaintiff has not identified sufficient evidence for a reasonable fact-finder to infer that defendant's explanation is pretextual or that plaintiff's termination was driven even in part by age discrimination, much less that age discrimination was the determinative, 'but for' factor.

Plaintiff points to his annual evaluations prior to 2003, in which his job performance was deemed satisfactory, to refute defendant's explanation of his termination as performance-based. The mere fact that an employee received positive performance evaluations and subsequently received negative evaluations is insufficient to establish that the latter were pretextual. See Moorer v. Grumman Aerospace Corp., 964 F. Supp. 665, 674 (E.D.N.Y. 1997); Orisek v. Am. Inst. of Aeronautics and Astronautics, 938 F. Supp. 185, 188 (S.D.N.Y. 1996). Accordingly, plaintiff's reliance on his pre-2003 evaluations would be fruitless even if they had been unequivocally glowing, which they decidedly were not. In fact, those evaluations weigh heavily against an inference of pretext because they show that the proffered nondiscriminatory grounds for plaintiff's termination were articulated by defendant long before any whiff of litigation, and indeed, long before plaintiff alleges he first suffered discriminatory treatment at defendant's hands. Plaintiff clearly struggled with the demands of his job for years, and his supervisors thoroughly documented their mounting concerns about his work quality and quantity and his proficiency with computer applications and member examination procedures.

To discredit the litany of performance-related complaints stated by plaintiff's supervisors in his September 2003 written warning, December 2003 probation memorandum, 2003 annual

performance review and April 2004 termination letter, plaintiff offers his own conflicting perceptions and opinions. These are of no moment. The relevant inquiry is not whether the performance-based justification for plaintiff's termination articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification. See DeMarco, 4 F.3d at 170-71. Plaintiff cannot accomplish this by stating his disagreement with his supervisors' negative assessment of his performance, "even [if he] has evidence that the decision was objectively incorrect." Karla v. HSBC Bank USA, N.A., 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008); see Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) ("[P]laintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim."). In this context, "it is not the function of a fact-finder to second-guess business decisions regarding what constitutes satisfactory work performance." Soderberg v. Gunther Int'l, Inc., 124 Fed. Appx 30, 32 (2d Cir. 2005) (quoting Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988)); see Thomley v. Penton Publ'g Inc., 104 F.3d 26, 29 (2d Cir. 1999) ("Whether job performance was satisfactory depends on the employer's criteria for the performance of the job – not the standards that may seem reasonable to the jury or judge.").

In short, "[t]his Court does not sit as a super-personnel department that reexamines an entity's business decisions." Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)). Notwithstanding, the Court is cognizant that, based on some confluences of circumstances, a reasonable fact-finder may find that an employer's business decision was "so lacking in merit as to call into question its genuineness." Dister, 859 F.2d 1108, 1116 (2d Cir. 1988); see Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir. 1980) (a defendant's proffered reason may be "so ridden with error that defendant could not honestly have relied upon it"). These are not those circumstances. Miller does not

dispute his supervisors' complaints on a factual level, but instead endeavors to explain them away with mitigating details and/or downplay them as petty and de minimis. In other words, plaintiff focuses on rationalizing his unsatisfactory performance rather than demonstrating an existence of a genuine issue of material fact to be tried. See Ralkin v. N.Y.C. Transit Auth., 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999).

Finally, Miller's sweeping statements that he received harsher treatment than other, younger employees and that Sachdev "routinely ignore[d] similar deficiencies from younger employees" are baldly conclusory and utterly unsubstantiated by any specific facts in the record. When an employer accused of discrimination provides convincing evidence explaining its conduct, and the plaintiff's case rests on conclusory allegations such as these, it is proper for a court to conclude that there is no genuine issue of material fact and to grant summary judgment for the employer. See Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995).

Thus, because plaintiff has failed to offer evidence to demonstrate that defendant's proffered reason for his termination is pretextual, and that his age was the true reason, the Court grants summary judgment in favor of defendant on plaintiff's ADEA claim.

## C. ERISA Claim

Section 510 of the Employee Retirement Income Security Act ("ERISA") provides, in relevant part, that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under

the plan." 29 U.S.C. § 1140 (2006). "An essential element of plaintiff's proof under the statute is to show that an employer was at least in part motivated by the specific intent to" interfere with his ERISA rights. Dister, 859 F.2d at 1111. There is no cause of action "where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." Id.

A plaintiff alleging discriminatory discharge in violation of § 510 must demonstrate the employer's "unlawful purpose in firing him." Id. Because there will rarely be direct evidence of such specific intent, the McDonnell Douglas burden-shifting framework also applies here. See Giordano v. Thomson, 564 F.3d 163, 169 (2d Cir. 2009); Dister, 859 F.2d at 1112. Thus, a plaintiff establishes a prima facie case in this context by showing that he: (1) was a member of an employee benefit plan; (2) was qualified for the position he held; and (3) was discharged under circumstances that give rise to an inference of discrimination. See id. at 1114-15. If the plaintiff establishes his prima facie case, "a presumption arises that the employer unlawfully discriminated against the employee," and the employer must then "articulate – but not prove – a legitimate, nondiscriminatory reason for the discharge." Id. at 1112, 1115. If the employer does so, the plaintiff must then adduce evidence which, "at a minimum[,] create[s] a genuine issue of fact as to [defendant's] offered reasons or as to a discriminatory motive," i.e., indicates that the rationale advanced might be "unworthy of credence." Id. at 1113, 1115.

Miller has failed to make out a prima facie case under § 510, because he has not shown or even alleged any fact related to his termination to make pension-based animus a more plausible culprit in this case than in any other instance that an employee enrolled in an ERISA plan loses his job. Miller's discharge did not deprive him of his pension altogether – he was already a vested member of NASD's pension benefit plan when he was terminated, and, accordingly, he

24

received a six-figure payout. What Miller did lose when he was terminated was the chance to accrue additional benefits during two more years of employment and then take early retirement. He has not identified any instance in which he communicated to anyone at NASD that he intended to opt for early retirement as soon as he became eligible, or in which anyone made a statement that led him to believe that NASD planned to terminate him in order to stiff him on this pension option. While the absence of such comments would not be dispositive in the presence of some other indicia of discrimination, Miller has simply not come up with any circumstantial evidence at all that a reasonable fact-finder might rely upon to determine that his termination was in some part driven by his employer's intent to interfere with his enjoyment of his benefits. Rather, the record makes plain that the foreclosure of early retirement was merely an unfortunate consequence of, instead of a motivation behind, defendant's decision to fire plaintiff.

The proximity of a plaintiff's termination to the date when his retirement benefits were scheduled to vest may constitute circumstantial evidence contributing to an inference of discrimination. See, e.g., Dister, 859 F.3d at 1115 (termination four months and one week before benefits were to vest supported inference); Quinby v. WestLB AG, No. 04 Civ. 7406, 2007 WL 1153994, at *15 (S.D.N.Y. Apr. 19, 2007) (two weeks); Young v. Bank of Boston Conn., No. 93 Civ. 1642, 1995 WL 908616, at *5 (D. Conn. Mar. 31, 1995) (six months); Corcoran v. GAB Bus. Servs., Inc., 723 F. Supp. 966, 969 (S.D.N.Y. 1989) (seven months). But Miller would not have been eligible for early retirement until more than two years after the date of his termination, and, moreover, his termination date was the endpoint of disciplinary proceedings initiated nearly six months earlier. This interval renders the connection too tenuous to suggest that defendant terminated plaintiff in order to deny him early retirement. See, e.g., Turner v. Schering-Plough

Corp., 901 F.2d 335, 338 (3d Cir. 1990) (where employee was terminated after 37 years of employment, when his benefits were partially vested but two and a half years before he would have been eligible to retire with 100% benefits, no inference of pension-based discrimination could be drawn); Millane v. Becton Dickinson & Co., 84 F. Supp. 2d 282, 288 (D. Conn. 1999) (no inference from termination three years before benefits were to vest); Duffy v. Drake Beam Morin, No. 96 Civ. 5606, 1998 WL 252063, at *10 (S.D.N.Y. May 19, 1998) (same).

Additionally, in deciding § 510 claims, courts "consider as one factor whether an employer would save substantial amounts of money by terminating an employee." Mohamed v. Sanofi-Aventis Pharms., No. 06 Civ. 1504, 2009 WL 4975260, at *19 (S.D.N.Y. Dec. 22, 2009); see, e.g., Dister, 859 F.2d at 1115. As with virtually every claim like this that is advanced, there would have been some savings to the pension plan. As noted above, because Miller's pension benefits were partially vested at termination, Miller received a lump sum payout from NASD's retirement plan of $107,437.98 in July 2004. Had Miller remained at NASD until his 55th birthday and taken early retirement as soon as he was able, NASD estimates that he would have been entitled to a lump sum pension payout of approximately $251,201.32. As of the date of Miller's termination, the total assets of the NASD Group Trust were valued at approximately $170 million. Thus, the additional money which plaintiff might have accrued if he had not been terminated comprised only 0.085% – less than a tenth of one percent – of his employer's plan. This cannot reasonably be considered a "substantial cost savings" evincing an incentive for plaintiff's termination.

Lastly on this score, even assuming *arguendo* that plaintiff had established a prima facie case under ERISA § 510, NASD presented a legitimate, nondiscriminatory reason for plaintiff's termination: the failure to improve his subpar performance after years of opportunity to do so.

Just as plaintiff has failed to adduce evidence to demonstrate that this explanation was a pretext for age discrimination, see supra at 20-23, he has not shown any reasonable basis for a conclusion that it was a pretext for pension-based discrimination. Accordingly, the Court grants summary judgment in favor of defendant on plaintiff's ERISA claim.[9]

## D. Attorney's Fees

Having prevailed on plaintiff's ADEA and ERISA claims, defendant requests that the Court award its attorneys' fees and costs.

"[F]ees may be awarded to prevailing defendants in age discrimination cases under the 'bad faith' exception to the general 'American Rule' against awarding any attorney's fees." Steinberg v. St. Regis/Sheraton Hotel, 583 F. Supp. 421, 424 (2d Cir. 1984). Under the bad faith exception, in the absence of statutory authorization, the Court in its discretion may award attorney's fees to a prevailing defendant where the action brought by the plaintiff was unreasonable, frivolous, meritless, or vexatious. See id.; see generally Alyeska Pipeline Serv. v. Wilderness Soc'y, 421 U.S. 240, 258, 95 S. Ct. 1612, 1622 (1975). This discretion is to be exercised sparingly. See Carrion v. Yeshiva Univ., 535 F.2d 722, 726-27 (2d Cir. 1976) ("[A] prevailing defendant should be permitted such fees, not routinely, not simply because he succeeds, but only where the action brought is found to be unreasonable, frivolous, meritless or vexatious." (emphasis added)).

As to an ERISA § 510 claim, the statute provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In

---

[9] Because plaintiff's ERISA claim fails as a matter of law, the Court need not reach defendant's alternative argument (relegated to a single footnote) that the claim should be dismissed for plaintiff's failure to exhaust administrative remedies provided for by his pension plan. However, the Court observes that the Second Circuit has explicitly rejected the view that such exhaustion is a prerequisite to bringing an ERISA claim in federal court, finding instead that exhaustion of administrative remedies is merely an affirmative defense. See Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 446 (2d Cir. 2006) ("[W]e hold that a failure to exhaust ERISA administrative remedies is not jurisdictional, but is an affirmative defense.").

determining whether to grant a request for attorneys' fees in an ERISA action, the Second Circuit

has delineated five factors to be considered: (1) the degree of the offending party's culpability or

bad faith; (2) the ability of the offending party to satisfy an award of attorneys' fees; (3) whether

an award of fees would deter other persons from acting similarly under like circumstances; (4)

the relative merits of the parties' positions; and (5) whether the action sought to confer a

common benefit on a group of pension plan participants. See Chambless v. Masters, Mates &

Pilots Pension Plan, 815 F.2d 869, 871 (2d Cir. 1987). In keeping with ERISA's statutory goal

of vindicating retirement rights, see Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 298 (2d

Cir. 2004), the Chambless factors ordinarily balance against awarding recovery of attorney's fees

to prevailing ERISA defendants. See Celardo v. GNY Auto. Dealers Health & Welfare Trust,

318 F.3d 142, 147 (2d Cir. 2003); Salovaara v. Eckert, 222 F.3d 19, 28 (2d Cir. 2000); Critelli v.

Fidelity Nat. Ins. Co. of N.Y., 554 F. Supp. 2d 360, 363 (E.D.N.Y. 2008). Notwithstanding,

ERISA defendants may recover attorneys' fees under unusual circumstances, which are

commonly found when there is evidence of intentional dishonesty on the plaintiff's part. See,

e.g., Seitzman v. Sun Life Assur. Co. of Canada, Inc., 311 F.3d 477, 484-85 (2d Cir. 2002);

Sewell v. 1199 Nat'l Benefit Fund for Health & Human Servs., No. 04 Civ. 4474, 2007 WL

1434952, at *1 (S.D.N.Y. May 15, 2007); see generally Critelli, 554 F. Supp. 2d at 366-67

(suggesting that the standard for an award of fees to a successful ERISA defendant is close to

fraud).

Defendant contends that a fee award in its favor is warranted by Miller's admission at his

deposition that he knew of no facts supporting the allegations of discrimination on the basis of

his age, race, sex and creed when he made them in his NYSDHR charge.[10]  Further, defendant

---

[10] Defendant also makes much of plaintiff's answer to the follow-up question: "So that was a false statement; isn't that correct?" Plaintiff answered "Yes, it is." (Walker Aff., Ex. E at 160). Contrary to defendant's interpretation,

argues that it should not have to bear the costs incurred by plaintiffs' procedural blunders in this action.[11] Finally, defendant deems Miller's substantive allegations as lacking any foundation whatsoever. As to the allegations in his NYSDHR charge, Miller responds that defendant mischaracterizes his deposition testimony, which came in response to a leading question "at the end of a long deposition day," and that he "had a reasonable basis to claim discrimination even if, at the time, he did not have all the details." As to procedural gaffes, Miller argues that he pursued his state and federal claims against NASD in state court based on his reading of the EEOC's "right to sue" letter.

In sum, the Court finds that the instant circumstances do not warrant an award of fees to defendant under the standards of either the ADEA or ERISA. While plaintiff's ADEA claim failed on the merits, it does not sink to the level of the "unreasonable, frivolous, meritless or vexatious" ADEA claims that have warranted awards of attorneys' fees to defendants in other cases. Plaintiff was a member of the class protected by the ADEA, and he was entitled under the statute to pursue his suspicions of discrimination, which is so rarely made objectively apparent. It cannot be said that his age discrimination claim was, on its face, completely meritless or brought simply to harass or subdue his former employer. Cf. Carrion, 535 F.2d at 72 (discrimination suit motivated by malice and vindictiveness where the plaintiff continually perjured herself, attempted to obtain false testimony from fellow employees, and brought suit after failure of previous litigation on same facts). Moreover, while age was originally one of

---

the Court does not construe this as an admission by plaintiff that he had committed wholesale perjury in his 2003 NYSDHR charge, but merely an admission that, based on his knowledge at the time of the deposition in October 2006, he did not believe if defendant's legal position was accurate that he had legally competent proof that he had been discriminated against on the basis of his age, race, sex or creed.

[11] After NYSDHR found no probable cause to believe that NASD had discriminated against plaintiff and plaintiff unsuccessfully elected to pursue his remedies with the EEOC, plaintiff was barred from pursuing judicial relief under state law, but he filed a complaint in state court alleging state law claims against NASD regardless. Additionally, defendant asserted a claim for denial of pension benefits in violation of state law, which was preempted by ERISA.

several grounds for discrimination alleged by plaintiff in his NYSDHR charge, plaintiff stopped

pursuing the other claims when the utter absence of facts to support them became clear. See

Christiansburg Garment Co. v. EEOC, 434 U.S.412, 422 (S.D.N.Y. 1984) (plaintiff should be

assessed attorney's fees where it is found "that his claim was frivolous, unreasonable, or

groundless, or that the plaintiff continued to litigate after it clearly became so").

Likewise, while plaintiff's ERISA claim also failed, an award of attorney's fees and costs

to defendant on that claim is not "substantially justified" here, as the Chambless factors do not

decisively weigh in defendant's favor. See Slupinski v. First Unum Life Ins. Co., 554 F.3d 38,

48 (2d Cir. 2009). "The degree-of-culpability and relative-merits factors are closely related,"

making it "useful in some circumstances to consider them together." Seitzman, 311 F.3d at 483.

A benefits claimant who reasonably believes that he is entitled to benefits is not acting in bad

faith, even if the facts do not bear out his belief. See Salovaara, 222 F.3d at 29 (reversing a

finding of bad faith that heavily relied on the plaintiff's failure, due to a misunderstanding of the

case law, to produce evidence in support of his main arguments). Cf. Seitzman, 311 F.3d 477,

484-85 (2d Cir. 2002) (assessing attorney's fees against unsuccessful claimant for disability

benefit; claimant's alleged total disability commenced within a 24-hour period, was not

accompanied by any physical trauma and closely coincided with the date plaintiff had previously

announced as his retirement date, and claimant successfully applied for other employment

approximately one month after the alleged onset of the disability); Sewell v. 1199 Nat'l Benefit

Fund for Health & Human Servs., No. 04 Civ. 4474, 2007 WL 1434952, at *1 (S.D.N.Y. May

15, 2007) (fees assessed against physician suing as assignee of plan beneficiaries where there

was strong evidence physician had engaged in fraudulent billing practices). Nor does it appear

that the deterrence interest would be served by awarding fees to defendant here. See Salovaara,

222 F.3d at 31 ("[W]here ... an ERISA plaintiff has pursued a colorable claim, the third Chambless factor likely is not merely neutral, but weighs strongly against granting fees to the prevailing defendant."). The deterrence factor serves "as a shield, to protect beneficiaries from the fear of having to pay to pursue an important ERISA claim in the event of failing to prevail," and not "as a sword to discourage beneficiaries" from pursuing certain meritless claims. Seitzman, 311 F.3d at 486 (quoting Gibbs, 210 F.3d at 505 (5th Cir. 2000). Under these circumstances, it is irrelevant whether the action sought to confer a common benefit on a group of pension plan participants or whether plaintiff might be able to satisfy an award of attorneys' fees.

## CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment on plaintiff's remaining claims of employment-related discrimination is granted. The complaint is dismissed. Defendant's motion for attorneys' fees is denied. Each party is to bear their own costs.

The Clerk is directed to enter judgment for defendant and to close this case.

SO ORDERED.

Dated:      Brooklyn, New York
           April _6_ , 2010

                                          ERIC N. VITALIANO
                                          United States District Judge